UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
WILLIAM SPATZ,

                     Plaintiff,                        **COMPLAINT**

        -against-                      Plaintiff  hereby demands trial
                                          by jury on all issues so triable.
ZACHARY STEWART and THEATERMANIA,

                    Defendants.
-------------------------------------------------------------------x

      Plaintiff William Spatz, by his attorneys, Law Office of Richard A. Altman, for his Complaint against Defendants Zachary Stewart and TheaterMania (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.  This is an action for libel *per se*, and false statements causing special damages. Defendant Zachary Stewart, a theater critic writing for Defendant TheaterMania, authored and published a review of a theatrical production written and presented by Plaintiff. The production was a serious, historically grounded drama confronting the Holocaust, the founding of the State of Israel, the 1948 Arab-Israeli War, the tragedy of a miscarriage, and the racially motivated execution of a Black man for loving a white woman. Yet it was deliberately, falsely, and maliciously described that production as a "buddy comedy."

2.  "Buddy comedy" is a recognized, defined genre of entertainment characterized by lighthearted humor, comedic situations, and the playful chemistry between two lead characters. It is the antithesis of everything the Play is, and was intended to be. The false characterization was not an expression of subjective taste or aesthetic preference. It was a false statement of verifiable, objective fact.

3.   Plaintiff believes and therefore alleges that Defendant Stewart's false and injurious characterization was not an act of good-faith criticism, but rather an act of ideological sabotage, motivated by Stewart's known and documented hostility toward the State of Israel and the Jewish people, and his sympathies with the Palestinian and Gaza cause.

4.   On information and belief, his intention was to maliciously undermine a production that treats the Holocaust and the birth of Israel with historical accuracy and dramatic seriousness.

5.   The harm was immediate, severe, and ongoing. Ticket sales plummeted by fifty percent (50%) the day following the Review's publication and by 65% the second day after the review. The play closed two months prior to its scheduled closing due to continuing daily losses caused by the review.

6.   The Play's prospects for awards recognition were eliminated since it did not run long enough to qualify for them.

7.   The ability of Plaintiff to mount future productions of the Play was substantially jeopardized. Ten other published reviews of the Play were uniformly positive — confirming that Defendant Stewart's characterization was a malicious outlier bearing no relationship to reality.

8.   Plaintiff brings this action seeking compensatory damages, punitive damages, injunctive relief, and all other relief to which they are entitled under the laws of the State of New York.

### THE PARTIES

9. Plaintiff William Spatz ("Spatz") is an individual residing in the State of Florida and is the playwright, and the producer/manager associated with the theatrical production that is the subject of the Review.

10. Upon information and belief, Defendant Zachary Stewart ("Stewart") is an individual residing in the State of New York, who at all times relevant herein acted as a theater critic and

journalist employed by or under contract with TheaterMania. He is the author of the false and defamatory Review that is the subject of this action.

11.    Upon information and belief, Defendant TheaterMania is a business entity organized under applicable law and doing business in the State of New York, which operates an online publication and platform that commissions, edits, publishes, and disseminates theater reviews and related content to the general public.

12.    TheaterMania employed or retained Stewart, assigned him to review the Play, and published the Review under its editorial control.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1441(a)(1), in that it is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

14.    This Court has personal jurisdiction over Defendant Stewart because, upon information and belief, Stewart resides in the State of New York, authored the Review within the State of New York, and/or caused tortious harm within the State of New York.

15.    This Court has personal jurisdiction over Defendant TheaterMania because, upon information and belief, TheaterMania is organized, headquartered, and/or conducts substantial business operations within the State of New York, and published the defamatory Review within the State of New York.

16.    Venue is proper in this Court because one or more Defendants reside or maintain a principal place of business in this District.

## FACTUAL ALLEGATIONS

A.  The Play

17.  At all times relevant herein, Plaintiff  was  involved in producing, promoting, and presenting a theatrical production entitled "Truman vs. Israel" (the "Play"), a serious, historically grounded dramatic work of substantial artistic and cultural significance.

18.  The Play is, in all respects, a serious drama. It does not contain comedic plot lines, comedic characters, physical comedy, comic timing, comic volley, or any other element associated with the buddy comedy genre or any comedy genre.

19.  Rather, the Play examines, with gravity, emotional depth, and historical fidelity, the following subjects:

(a)  The Holocaust — the systematic genocide of six million Jewish people — and its shattering impact on Jewish identity, memory, and historical consciousness as addressed by one of the characters and the death of his wife and two children in Auschwitz;

(b) President Harry Truman's role in the founding of the modern State of Israel and the political, moral, and historical forces that gave rise to it;

(c)  The 1948 Arab-Israeli War, including its causes, conduct, and consequences;

(d)  The racially motivated execution of a Black man, Mr. Willie McGee, whose appeal was handled by Bella Abzug in real life. He was put to death for engaging in a loving, consensual interracial relationship with a white woman — an actual historical injustice representing the brutal reality of American racial violence;

(e)  A devastating miscarriage suffered by Bella Abzug (one of the referenced "buddies" and Truman's attorney in the Play) suffered just after the McGee hearing, presented with honesty and emotional weight;

(f)  The dropping of two atomic bombs on Japan, three days apart;

(g) Truman's role in the recognition of the new State of Israel;

(h) Truman's inability to get civil rights legislation passed and other failures;

(I)  Truman's years growing up including his experiences in the army;

(j)  Truman's relationship with his best friend, Eddie Jacobson;

(k)  The United States arms embargo from 1948-1963;

(l)   Truman's wife's and mother-in-law's apparent anti-semitism;

(m) Bella Abzug's role in the women's rights movement;

(n) Al Schwimmer, who smuggled arms to Israel and was stripped of his citizenship and fined for doing so. Without him, Israel would have likely lost the war of 1948. He is considered the father of the Israeli air force.

20.  The Play has been presented to the public and received wide critical attention. Every review of the Play published by critics other than Defendant Stewart (a total of ten) was positive, substantive, and accurately reflected the Play's serious, historically grounded dramatic content.

21.  None of the ten positive reviews characterized the Play as a comedy, a buddy comedy, or as anything other than the serious fictional historical drama it is.

B.  Defendant Stewart's Assignment and Publication of the Review

22.  Upon information and belief, Defendant TheaterMania assigned Defendant Stewart to attend a performance of the Play and author a published review on its behalf, in the ordinary course of TheaterMania's editorial operations.

23.  Upon information and belief, prior to attending the Play, Defendant Stewart held and publicly expressed views hostile to the State of Israel, supportive of the Palestinian and Gaza cause, and critical of the Zionist historical narrative that the Play treats with accuracy and respect.

24.  On or about October 16, 2025, Defendant Stewart authored a review of the Play (the "Review"), which was published online by Defendant TheaterMania and made available to the

general public, including readers in New York County and throughout the United States. A true and complete copy is annexed as Exhibit A.

25. In the Review, Defendant Stewart falsely and maliciously stated and/or mischaracterized the Play as a "buddy comedy," or used language of equivalent false and misleading effect, thereby representing to the theater-going public, industry professionals, awards bodies, and future venue operators that the Play is a lighthearted, comedic work of the buddy comedy genre.

26. This statement is objectively, demonstrably, and categorically false. The Play is not a "buddy comedy." It shares no characteristics with the buddy comedy genre. It addresses the Holocaust, war, racial murder, and personal tragedy. No fair-minded person who attended a performance of the Play, read its script, or consulted any of the ten other published reviews could in good faith characterize it as a buddy comedy.

27. Defendant Stewart also made the following statements in the review and through his actions that indicate a clear bias against the Play and its subject matter.

28. Defendant Stewart states in the review "If you have not yet tired of parsing historical minutiae around Israel and its insalubrious relationship with the United States…" Insalubrious means harmful, unhealthy, unsafe, sordid, and injurious indicating a strong bias against Israel.

29. Defendant Stewart asks the question "Why didn't Truman commit American tax dollars to Israel's defense?" as if the Play said it should. There is no mention of tax dollars in the Play so this indicates a political position.

30. In fact, the embargo had nothing to do with the United States supplying arms to Israel or using tax dollars, as was explained in the Play. The embargo was implemented to stop Americans from sending arms to Israel and made it a criminal offense for an American to fight for the new State of Israel or supply arms to it. A central character regarding the embargo in the Play was Al Schwimmer, as referenced in Paragraph 19(n).

31.  Defendant Stewart states in the review that Bella Abzug and her assistant traveled to Truman's home "to discuss a potential libel lawsuit against a newspaper columnist who has accused him of being insufficiently supportive of Israel." As stated in the Play, the title of the column was "Bigotry, Bombs, and Broken Promises." It went on to address Truman's low approval rating, his lack of commitment to the civil rights cause, his support of Israel in order to get the Jewish vote, his arms embargo, and his failure as a President. Once again, the review indicates the reviewer's obsession with Israel rather than reporting what the newspaper column was really about.

32.  Defendant Stewart received an invitation to screen the Play which included a synopsis of the Play. So before he arrived, he knew this wasn't a buddy comedy or a comedy in general.

33.  Defendant Stewart attended a talk back with the Plaintiff after the play ended. The Plaintiff addressed the fact that the Play was historical fiction, the setting and meeting was fictitious, but all the historical facts in the play were accurate. Therefore, Defendant Stewart knew that the Playwright's intent was never to write a buddy comedy.

34.  Defendant Stewart originally was scheduled to attend the first scheduled preview at 3:00 pm on October 9, 2015.  When that was canceled, he re-scheduled for the new first premier on October 11. It is highly unusually and somewhat unethical to attend a first premier unless his schedule dictated it – which in this case it clearly did not.

35.  Equally unusual and highly unethical, Defendant Stewart published the review at 9:01 pm on opening night, a full 10+ minutes before the play had ended.

36.  In all of Defendant Stewart's reviews, he spends significant space to describe the play and its characters. In this review, he dedicates one paragraph to setting up the premise of the play and four sentences about Truman's recognition of Israel, the libel suit Truman wanted to bring, and the arms embargo.

37. Defendant Stewart places the description "buddy comedy" in the title of the review so that anyone looking at the Review will be misled before they even read it.

38. In the review, the term "comedy" never appears, indicating that Defendant Stewart knew it wasn't a comedy. The word "comic" appears just once as part of the phrase "comic volley." The term "comic volley" is closely related to the terms like repartee, banter, and stichomythia (the classical dramatic term for rapid line-for line exchanges). But "comic volley" emphasizes the athletic, kinetic quality of the exchange, like a sense of humor in motion.

39. Since the Reviewer used the term, he would have known the meaning and known that it did not occur in the Play.

40. The Play was presented the Theatre at St. Clement's in Manhattan, a venue with only 140 seats. On information and belief, this theater was by far the smallest venue for any play which Defendant Steward has reviewed in the last three years.

41. This would indicate that his desire to review the Play was possibly based upon his desire to attack its subject matter, outside of the normal factors on whether to review a play.

42. Plaintiff therefore believe and allege that Defendant Stewart's false characterization was not the product of good-faith critical engagement with the Play, but was instead a deliberate and malicious misrepresentation motivated by his ideological hostility toward Israel, the historical experience of the Jewish people, and a pro-Palestinian belief.

43. Upon information and belief, Defendant TheaterMania published the Review under its editorial oversight and control, without taking any steps to verify whether the false characterization of the Play as a "buddy comedy" had any basis in fact, and with knowledge or reckless disregard of its falsity, or at minimum with negligence in failing to exercise the reasonable editorial care required before publishing a factually false characterization of a theatrical production.

44.  Because of that disregard, Defendant TheaterMania is a co-publisher of the Review, and is jointly and severally liable with Defendant Stewart.

C.  The False Statement Is Not Protected Opinion

45.  Defendants will likely contend that the characterization of the Play as a "buddy comedy" is a protected expression of opinion. That contention is without merit.

46.  Under New York law, a statement is not automatically shielded as opinion merely because it appears in a review or critical article.

47.  Whether a statement constitutes actionable fact or protected opinion depends upon whether (I) it has a precise and readily understood meaning capable of being proven true or false; (ii) it can be characterized as opinion given its full context; (iii) the broader social context signals that it is opinion; and (iv) it objectively verifiable as true or false.

48.  All four factors favor Plaintiff  here. "Buddy comedy" has a precise, well-understood meaning in the entertainment industry and the culture at large. It denotes a specific narrative genre defined by comedic tone, humor-driven plot, and the dynamic between two lead characters played for laughs. That meaning is objective and verifiable.

49.  The Play either is or is not a buddy comedy, and it plainly is not. The statement is therefore not opinion; it is a false statement of fact.

50.  Moreover, even within the context of a critical review, the First Amendment does not protect a critic who makes a false statement of fact disguised as opinion.

51.  A critic may say "I found this play dull" or "the pacing felt slow." Those are opinions. But a critic may not say "this play is a buddy comedy" when it manifestly is not. That is not criticism; it is a false statement of fact.

D. Damages

52. As a direct and proximate result of Defendants' publication of the false and defamatory Review, Plaintiff suffered severe and continuing harm.

53. Ticket sales for the Play dropped substantially immediately after publication of the Review. The ticket sales were $3,619.90 per day before the opening and $3,025.30 the day of the opening.

54. But the sales were $1,485.20 (51% decline) the day after the opening when the review was fully viewable and $1,213.80 (60% decline) on the second day after the opening.

55. This decline is directly and reasonably attributable to the false characterization, which misled theatergoers seeking a serious dramatic experience, into believing the Play was a lighthearted comedy, and deterred others from attending based on a false understanding of the Play's content and genre.

56. Plaintiff ' ability to submit the Play for consideration for theatrical awards — including awards that rely substantially on published critical reviews in making nomination and selection decisions — was materially and irreparably damaged by the false Review.

57. Plaintiff's ability to arrange future productions of the Play at other venues, in other cities, and before other audiences has been substantially impaired. Theater presenters, venue operators, and co-producers routinely consult published critical records when making booking and production decisions.

58. The professional and artistic reputation of the Plaintiff has been materially harmed by the false Review's implication that the Play is a trivial entertainment or that Plaintiff failed to produce and present the work as the serious drama it is. The review is thus defamatory *per se*.

59.  In addition, Plaintiff has suffered and continues to suffer actual damages of over $300,000 and special damages in an amount to be proven at trial, but no less than Two Hundred Thousand Dollars ($200,000.00) plus punitive damages as the Court may determine.

**FIRST CAUSE OF ACTION**
**(Libel Per Se)**

60.  Plaintiff  re-allege paragraphs 1 through 59.

61.   Defendant Stewart authored, and Defendant TheaterMania published, a false and defamatory statement of fact to the general public, which is demonstrably and objectively untrue.

62.   The false statement was published in written form, on the internet, accessible to the general public, and constitutes libel under New York law.

63.   The false statement constitutes libel per se because it tends to injure Plaintiff  in their respective trades, businesses, and professions. Specifically, falsely characterizing the genre of a theatrical production: (a) misleads prospective audiences and reduces ticket sales; (b) damages the production's eligibility for and prospects of receiving theatrical awards; (c) harms the ability of producers and presenting institutions to mount future productions of the work; and (d) injures the professional reputations of all those responsible for the production.

64.  Defendant Stewart published the false characterization with actual malice, that is, with knowledge of its falsity or with reckless disregard for whether it was true or false.

65.  Said malice is demonstrated by the following: (a) the content of the Play so plainly and unambiguously contradicts the "buddy comedy" characterization that no person who attended the Play in good faith could hold that view; (b) the ten other critics who reviewed the Play unanimously described it as a serious drama, not a comedy of any kind; and (c) Defendant Stewart's ideological hostility toward the Play's subject matter provides a non-critical, bad-faith motive for the false characterization, and (d) as a voting member of the New York Drama critic's circle and playwright,

-11-

he would have known the Play was not a buddy comedy, and (e) he placed the buddy comedy statement in the headline of the review to make sure it would not be missed by a reader.

66.   Defendant TheaterMania is liable for libel *per se* as the publisher of the Review, because it published the Review under its editorial control, with knowledge or reckless disregard of its falsity, or at minimum with negligence in failing to exercise reasonable editorial care before publishing a false factual characterization of a theatrical production.

67.   As a result of Defendants' libel *per se*, Plaintiff are entitled to presumed damages. In addition, Plaintiff has suffered actual and special damages including lost ticket revenue resulting from the approximately fifty percent (50%) decline in ticket sales the day following the Review's publication; lost awards opportunities; lost future production opportunities; and harm to the professional and institutional reputations of Plaintiff .

68.   Defendants' conduct was willful, malicious, wanton, and in reckless disregard of Plaintiff's rights, entitling them to punitive damages in an amount to be determined by the jury at trial.

### SECOND CAUSE OF ACTION
### False Statement; Special Damages

69. Plaintiff re-allege paragraphs 1 through 59.

70.   The Statement was false.

71.   As a direct result of the false Statement, Plaintiff suffered special damages, as set forth in Paragraphs 52 through 59.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff William Spatz respectfully demands judgment against Defendants Zachary Stewart and TheaterMania, jointly and severally, as follows:

(a)  Compensatory damages for libel per se, including presumed damages for injury to professional reputation, in an amount no less than Five Hundred Thousand Dollars ($500,000.00);

(b)  Punitive damages in an amount to be determined by the jury at trial, sufficient to punish Defendants for their malicious and wanton conduct and to deter similar conduct in the future;

(c)  Prejudgment and post-judgment interest at the maximum rate permitted by New York law;

(d)  A permanent injunction directing Defendants to cease from publishing the Review from TheaterMania's and Zachary Stewart's websites and social media accounts and all other platforms under Defendants' control;

(e)  Attorneys' fees and costs of suit to the extent permitted by applicable law or equity; and

(f)  Such other and further relief as this Court deems just, equitable, and proper.

Dated: New York, New York
        June 17, 2026

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
150 East 56th Street, Suite 12B
New York, NY 10022
212.633.0123
altmanlaw@earthlink.net

# EXHIBIT A

https://www.theatermania.com/news/review-truman-vs-israel-the-hary-truman-bella-abzug-buddy-comedy-nobody-asked-for_
1807773/

# THeliT@RMANIA

October        025

# Review: *Truman vs. Israel,* the Harry Truman-Bella Abzug Buddy Comedy Nobody Asked For

William Spatz's historical play bows off-Broadway.



Willy Falk plays Harry Truman, and Helen Laser plays Bella Abzug in William Spatz's Truman vs. Israel, directed by Randy White, at Theatre at St. Clement's.
(C) Darin Chumbley)

**By Zachary Stewart**

**There's a notion that putting two big personalities onstage will naturally lead to dramatic alchemy. That flawed assumption seems to have driven William Spatz to write** *Truman vs. Israel,* **which is now making its off-Broadway debut at Theatre at St. Clement's. It's about the famously pugnacious American president whose sparring partner is revealed in the subtitle: "Abzug and the Undressing of Truman." It sounds a lot more titillating than it is.**

**The opening scene depicts a soldier (Matt Caplan) pinned down by enemy gunfire in 1948. "I will have my day with you, HARRY FUCKING TRUMAN," he curses to the heavens, like a Marvel villain in the making.**

**Flash forward to 1988 and Rep. Bella Abzug (Helen Laser) is sitting for a portrait. News of the first intifada broadcasts from the radio, leading the painter (Mark Lotito) to refer to Israel as an "apartheid state." Abzug responds with incredulity and, since she has a captive audience, decides to regale her portraitist with a story about the time in 1953 when she, still a young lawyer, traveled with her associate, Don Muller (Caplan), to the Missouri home of former President Harry S. Truman (Willy Falk) to discuss a potential libel lawsuit against a newspaper columnist who has accused him of being insufficiently supportive of Israel.**

**Sure, the president formally recognized Israel just 11 minutes after David Ben-Gurion declared its establishment on May 14, 1948, making him the first world leader to do so. But what about the arms embargo Truman maintained on Israel (and all Middle Eastern countries) during the subsequent war, when multiple Arab armies attempted to crush the fledgling Jewish state? Abzug and Muller attempt to dissuade Truman from filing suit by simulating the cross-examination he is likely to receive: Why didn't Truman commit American tax dollars to Israel's defense? Did he recognize it for the right reasons? Isn't he, in fact, an antisemite?**



**Willy Falk, Matt Caplan, and Helen Laser appear in William Spatz's** *Truman vs. Israel,* **directed by Randy White, at Theatre at St. Clement's.**

(© Darin Chumbley)

If you have not yet tired of parsing historical minutiae around Israel and its insalubrious relationship with the United States, walk (but please, don't run; you might break a hip) to the box office at Theatre at St. Clement's.

Setting aside the implausible premise (there is no record of Truman and Abzug ever meeting) and tedious subject matter (there is a slide show about secondhand Messerschmitt fighter planes), *Truman vs. Israel* fails to marshal the mercurial historical figures at its core into a halfway decent comic volley. Weighed down by excessive exposition (the play also rehashes Truman's military and political careers), it mostly falls back on stale Trumanisms ("if you want a friend in Washington, buy a dog!") and Abzugian absurdities (at one point she starts haranguing the allegedly antisemitic ex-president in Yiddish). Oy *vey.*

Randy White directs the cast in performances that are spirited, if under-rehearsed. With her fast-talking funny girl schtick, Laser seems to be auditioning for the lead in the stage adaptation of *The Marvelous Mrs. Maisel* (in fairness, she only joined the cast two weeks ago, stepping in for Sasha Eden, so this is a fine first pass at a character that has already received multiple  dramatic interpretations).   But there's no excuse for Falk, who has been with the production since it was announced yet still seems shaky on his lines.



Eddie Jacobson (Mark Lotito) delivers *the line* to Don Muller (Matt Caplan) in the off-Broadway production of *Truman vs. Israel.* *(*© Darin Chumbley)

Lotito is stiff but affable in his two roles as the painter and Eddie Jacobson, Truman's old army buddy and business partner, who shows up as a crucial Jewish character witness and musters all the pique one can for the ludicrous line, "Are you a lawyer, Mr. Muller, or just someone with something up their ass?" And Caplan more than plays his part as the tragically constipated attorney whose motives and actions never quite pass the smell test but mercifully bring this 90-minute slog to its thudding conclusion.

At least the show is handsomely designed, with a lovely parlor set by Lauren Helpern, convincing period costumes by Sydney Gallas, precise lighting by Tyler Micoleau (this really helps facilitate

Spatz's habit of jumping from the main plot to the frame), and naturalistic sound design by Elisabeth Weidner.

While this is being billed as a world premiere, an earlier draft was presented in 2018 at Chicago's Greenhouse Theater, where Spatz serves as executive director. I suspect this is the nicest production this play will ever receive—and that's the nicest thing I can say about it.

https://www.theatermania.cominews/review-truman-vs-israel-the-harry-truman-bella-abzug-buddy-comedy-nobody-asked-for_I 807773/